# Exhibit A

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (this "Agreement") is made and entered into by and between MABA Holdings ("Company"), with a principal place of business at 19 Summerlin Dr, LaPlace, La. 70068, and Delta Air Lines, Inc. ("Delta"), with a principal place of business at 1030 Delta Boulevard, Atlanta, GA 30354-1989, and is effective as of August 22, 2016 (the "Effective Date"). For the purposes of this Agreement, as the context requires, Company and Delta will be referred to as a "disclosing party" or a "receiving party."

In consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions**. As used herein, the following terms shall have the following meanings:

(a) "Project" shall mean Qrewlive Communications.

(b) "Affiliates" shall mean any individual, corporation, partnership, association, or business that directly or indirectly through intermediaries, controls, is controlled by or is under common control with a party. "Control" shall exist whenever there is an ownership, profits, voting, or similar interest (including any right or option to obtain such an interest) representing at least 50% of the total interests of the pertinent entity then outstanding.

(c) "Confidential Information" shall mean all non-public information (whether in writing or retained as mental impressions) concerning Company, Delta, Delta Connection Carriers®, Delta code share partners and their respective Affiliates, which has been disclosed to the receiving party or the Affiliates of the receiving party by or on behalf of the disclosing party or the disclosing party's Affiliates, directly or indirectly, in writing, orally, or by the receiving party's visual inspection or mental impression. Confidential Information does not include information that: (i) the receiving party can show was previously known to it as a matter of record at the time of receipt; (ii) is lawfully obtained by the receiving party from a Person who lawfully obtained the information free of any obligation of confidentiality; (iii) is or that becomes generally available to the public, through no action or fault of the receiving party; or (iv) has been or is independently developed by the receiving party or any other person as a matter of record, without reliance on the information provided by the disclosing party.

(d) "Permitted Systems" shall mean computer systems and files of Delta and its Affiliates that Delta expressly authorizes Company to access, use, or modify.

(e) "Person" shall mean any firm, corporation, group, organization, subsidiary, joint venture, partnership, trust, association, governmental authority, regulatory agency, natural person or legal entity.

(f) "Personally Identifying Information" or "PII" shall mean any information regarding identifiable individuals, including without limitation, data regarding the disclosing party's Personnel collected by or on behalf of the disclosing party or its Affiliates.

(g) "Personnel" shall mean employees, officers, directors, independent contractors, agents and authorized representatives of a Person.

(h) "Trade Secrets" shall mean information (whether in writing or retained as a mental impression) including, but not limited to, technical or non-technical data, a design, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, software code, documentation, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2. **Term**. The term of this Agreement shall begin on the Effective Date and end twenty-four (24) months thereafter. The confidentiality obligation with respect to Confidential Information received by either party shall remain in effect until three (3) years from the termination or expiration of this Agreement. The confidentiality

Rev. 03.14.14



obligation with respect to Confidential Information consisting of PII shall remain in effect in perpetuity; provided, however, that if governing law requires a reasonable limit upon the duration of such obligation for such obligation to be enforceable, the parties agree that a duration of seven (7) years from the later of the date of this Agreement or the date of receipt of the PII shall be deemed reasonable. The confidentiality obligation with respect to Confidential Information consisting of Trade Secrets received by either party shall remain in effect for as long as governing law allows.

3. **Rights in Confidential Information**. Each receiving party acknowledges that Confidential Information is and shall remain the sole and exclusive property of the disclosing party. No rights or licenses under copyright, patent or trademark of either party are hereby granted or implied by either a confidential or non-confidential disclosure, except either party may make a reasonable number of copies of documents in order to carry out the Project. Nothing in this Agreement or in any discussions undertaken or disclosures made pursuant to this Agreement shall: (a) be deemed as a commitment to engage in any business relationship, contract, or future dealings between the parties; or (b) limit either parties' right to enter into similar discussions or activities similar to that undertaken pursuant to this Agreement, so long as such discussions or activities do not violate this Agreement.

4. **Non-Disclosure, Access to and Use of Confidential Information**. Each party will protect the other party's Confidential Information from disclosure to Persons not authorized to receive it, as provided in this Agreement, with at least that degree of care used to protect the receiving party's own Confidential Information, but in any event with not less than reasonable care. Each receiving party shall not use, exploit, or reproduce such Confidential Information for its own or any other purpose except as reasonably necessary for the performance of the Project and as permitted by this Agreement. Each receiving party shall not provide or make available any of the disclosing party's Confidential Information in any form to any Person other than those Personnel of the receiving party or its Affiliates who have a need to know consistent with the Project and who are under a written obligation of confidentiality governing the Confidential Information at least as restrictive as the terms of this Agreement. In the event a receiving party desires to disclose Confidential Information to other Persons, it shall first obtain the written consent of the disclosing party, which consent shall not be unreasonably withheld, and shall obtain from that Person a fully executed confidentiality agreement reasonably acceptable to the disclosing party.

5. **Personally Identifying Information**. In addition to the other obligations in this Agreement, Company shall abide by the provisions of this Section 5 concerning PII. For the purposes of these provisions: the terms "process," "processing" or "processed" in relation to PII include, without limitation, collection, recording, organization, storage, amendment, retrieval, consultation, manipulation, and erasure.

(a) General: Delta has entrusted Company with PII. Company agrees to use reasonable measures to prevent the unauthorized processing, capture, transmission and use of PII which Delta may disclose to Company during the course of Delta's relationship with Company.

(b) Processing and Use of PII: Company shall process and use PII solely in accordance with the provisions of this Agreement. Company shall process and not use PII for any purpose other than the Project without Delta's express prior written consent. At any time, Delta may make inquiries to Company about PII transferred by Delta and stored by Company, and Company agrees to provide to Delta copies of such PII as maintained by Company within a reasonable time and to perform corrections or deletions of, or additions to, PII as reasonably requested by Delta.

(c) Inspection Rights: Delta shall have the right upon reasonable prior notice to verify Company's compliance with the terms and conditions of this Agreement, or to appoint a third party under covenants of confidentiality to verify the same on Delta's behalf. Company shall grant Delta's agents escorted access to the extent necessary to accomplish the inspection and review of all data processing facilities, data files and other documentation used by Company for processing and utilizing PII. Company agrees to provide reasonable assistance to Delta in facilitating this inspection function. These inspection rights shall survive the earlier expiration or termination of this Agreement for so long as the Company holds any item of Confidential Information or PII.

(d) Use of Subcontractors; Transmission of PII to Third Parties: Company may not transfer PII to any third party without Delta's prior written consent, and then only upon such third party's execution of an agreement containing covenants for the protection of PII no less stringent than those contained in this Agreement.

(e) Breach Notification: Company shall report security data or network security breaches to Delta in

Rev. 03.14.14                                                              5



a prompt and timely manner and assist Delta's Information Security and Privacy Office in its investigation thereof.

(f) Data Security: Company shall implement, at a minimum, the data security measures and observe the minimum standards for the protection of PII as set forth in this Section 5(f):

(i) Access of Persons: Company agrees to use reasonable measures to prevent unauthorized persons from gaining access to the data processing equipment or media where PII is stored or processed. Company agrees to provide its employees and agents access to PII on a need-to-know basis only and agrees to cause any persons having authorized access to such information to be bound by obligations of confidentiality, non-use and non-disclosure no less stringent than those imposed upon Company by this Agreement.

(ii) Data Media: Company agrees to use reasonable measures to prevent the unauthorized reading, copying alteration or removal of the data media used by Company and containing PII.

(iii) Data Retention: Company shall not retain PII any longer than is reasonably necessary to accomplish the intended purposes for which PII was transferred as set forth in this Agreement. Upon the earlier termination of this Agreement or the written request of Delta, Company shall delete and/or destroy all PII in Company's possession, including any copies thereof, and shall deliver a written statement to Delta within 15 days of Delta's request confirming that Company has done so.

(iv) Data Memory: Company agrees to use reasonable measures to prevent unauthorized data input into memory and the unauthorized reading, alteration or deletion of PII.

(v) Personnel: Upon request, Company shall provide Delta with a list of Company's employees and agents entrusted with processing the PII transferred by Company, together with a description of their access rights.

(vi) Transmission: Company agrees to use reasonable measures to prevent PII from being read, copied, altered or deleted by unauthorized parties during the transmission thereof or during the transport of the data media on which PII is stored.

6. **Remote Access**. In the event Company accesses Delta's Confidential Information by electronic means (including, without limitation, by remote or direct connection to Delta's computer systems, intranet, databases or extranet), Company, in addition to its other obligations in this Agreement, shall comply with the provisions of this Section 6.

(a) Access to Delta's computer systems, intranet, databases or extranet is not granted by this Agreement. Any such access shall only be exercised by Company following Delta's separate written consent, which consent shall refer to this Agreement, and which can be revoked by Delta at any time without cause.

(b) Company shall only access, use, or modify the Permitted Systems, notwithstanding that other Confidential Information and related computer systems and files may be accessible to Company.

(c) Company shall not permit or allow any unauthorized person or third party to access, use, or modify the Permitted Systems.

(d) Company shall, at a minimum, comply with any written guidelines from Delta related to remote or direct access; provided, however, that Company shall remain solely liable for the breach of any other obligations under this Agreement, notwithstanding Company's compliance with such guidelines.

(e) Company shall take commercially reasonable efforts to avoid the introduction into Delta's computer systems, intranet, databases or extranet, by way of remote or direct access or otherwise, of any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," "preventative routines" or other computer software routine designed: to permit unauthorized access to or use or modification of either the Confidential Information or Delta's computer systems, intranet, databases or extranet; to disable, modify, damage or delete the Confidential Information, or any data, computer hardware or other equipment or software operated or maintained by Delta; or to perform any other such similar actions.

7. **Return of Confidential Information**. Following the conclusion of the Project, each disclosing party's tangible Confidential Information shall be promptly returned by the receiving party to the disclosing party, and each receiving party will destroy any working papers, notes, copies, extracts, or other reproductions containing any part

Rev. 03.14.14                                              5

C.A.

of the disclosing party's Confidential Information. Upon request of the disclosing party, the receiving party shall deliver to the disclosing party a signed certification that all such working papers, notes, copies, extracts, or other reproductions have been destroyed; provided, however, nothing in this Agreement shall require the destruction of the other party's business records derived from the use of the disclosing party's Confidential Information to the extent such records are produced and maintained for administrative or archival purposes and are treated as Confidential Information under this Agreement.

8. **Remedies**. Each party advises the other that the disclosure of any of its Confidential Information may give rise to irreparable injury inadequately compensable in damages. Accordingly, when and as supported by the facts, the injured party may seek to obtain injunctive relief to prevent the unauthorized use or disclosure, whether existing, imminent or threatened, of its Confidential Information, in addition to any other remedies which may be available to it. All remedies shall be cumulative and all such remedies may be exercised from time to time and as often and in such order as the injured party deems expedient.

9. **Disclosure Pursuant to Legal Process**. Notwithstanding any provision to the contrary, the receiving party shall be allowed to release Confidential Information if compelled to do so by a court of competent jurisdiction, subject to the conditions that the receiving party: (i) takes reasonable steps to preserve the confidentiality of Confidential Information, including without limitation requesting that the Confidential Information not be released to third parties or the public; (ii) gives the disclosing party prompt notice of the legal process and gives the disclosing party the opportunity to seek an appropriate protective order or to pursue such other legal action necessary to preserve the confidentiality of the Confidential Information; and (iii) provides reasonable assistance to and cooperates with the disclosing party in its efforts to preserve the confidentiality of the Confidential Information.

10. **Disclaimer of Warranties**. Each party understands and agrees that it is receiving Confidential Information and that Company is accessing the Permitted Systems on an "as is" basis. NEITHER PARTY MAKES ANY WARRANTIES, EXPRESSED OR IMPLIED, CONCERNING ANY SUBJECT MATTTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT WITH RESPECT TO THE CONFIDENTIAL INFORMATION OR ACCESS TO THE PERMITTED SYSTEMS. Delta shall not be liable for damages of any kind whatsoever, whether direct, indirect, special, consequential or exemplary, resulting from Company's use of the Permitted Systems.

11. **Notices**. Any notice, demand or document which either party is required or desires to give or deliver to or make upon the other party shall be in writing and shall be (a) personally delivered or (b) delivered by depositing in the United States Mail, registered or certified, return receipt requested, with postage prepaid, addressed as follows:

If to Company:   MABA Holdings LLC
                 19 Summerlin Dr.
                 LaPlace, La. 70068
                 ATTN: Craig A. Alexander

If to Delta:     Delta Air Lines, Inc.
                 Department
                 1030 Delta Boulevard
                 Atlanta, GA  30320
                 ATTN:

                 with copy to General Counsel

or to such other address as the respective parties hereto shall designate by notice similarly given to the other party. Any such notice, demand or document shall be deemed to be effective upon receipt by the party to whom notice, demand or document is addressed.

12. **Miscellaneous**. This Agreement shall be binding upon the parties and their successors and permitted assigns. Neither party may assign all or any portion of this Agreement or any rights or obligations hereunder without the prior written consent of the other party and any such attempted assignment shall be void. This

Rev. 03.14.14                                                     5

*C.A.*

Agreement shall be governed by the laws of the state of Georgia, USA, without giving effect to its conflicts of law rules. No party's waiver of any breach shall extend to or waive any other breach or impair any rights, powers or remedies. In the event that any one or more of the provisions of this Agreement shall be determined to be invalid, unenforceable or illegal, such invalidity, unenforceability, or illegality shall not affect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, unenforceable, or illegal provision had never been contained in this Agreement. The captions and titles herein are for convenience only and are not intended to define or aid interpretation of the subject matter of the text. This Agreement may be executed in counterparts and if so executed in counterparts will be enforceable and effective upon the exchange of executed counterparts or exchange of facsimile transmissions of executed counterparts. The obligations set forth in this Agreement are in addition to, and not in lieu of, any fiduciary duties or obligations of confidentiality or nondisclosure that the parties may have to each other under the common law, laws providing for the protection of Trade Secrets, or other statutory law. This Agreement constitutes and represents the entire agreement between the parties as to its subject matter and supersedes the parties' prior written or oral agreements. Any provisions of this Agreement that by their nature should, or by their express terms do, survive termination or expiration of this Agreement, shall survive or extend beyond termination or expiration of this Agreement. This Agreement may be amended in whole or in part only in a writing signed by both parties that refers to this Agreement by name and date.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**Delta Air Lines, Inc.**

By: _[signature]_

Title: General Manager - IT SCM

Date: 8/30/2016

**MABA Holdings, LLC.**

By: _[signature]_

Title: Owner / CEO

Date: 6/22/16

Rev. 03.14.14

5

C,A